# United States Court of Appeals
## For the First Circuit

No. 15-1434

UNITED STATES ex rel. BLAIR HAMRICK,

Plaintiff, Appellant,

GREGORY W. THORPE; THOMAS GERAHTY; MATTHEW BURKE,

Plaintiffs,

v.

GLAXOSMITHKLINE LLC, f/k/a SMITHKLINEBEECHAM CORP. d/b/a
GLAXOSMITHKLINE,

Defendant, Appellee,

GLAXOSMITHKLINE, PLC,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Matthew Jacob Fogelman, with whom Fogelman & Fogelman LLC,
was on brief, for appellant.
Thomas S. Williamson, Jr., with whom Matthew J. O'Connor,
Benjamin J. Razi, David M. Zionts, and Covington & Burling LLP,
were on brief, for appellee.

February 17, 2016

**KAYATTA**, **Circuit Judge**. While employed by GlaxoSmithKline ("GSK"), Blair Hamrick ("Hamrick") told two Human Resource ("HR") managers that he was thinking about killing a co-worker. When Hamrick shortly thereafter told several co-workers that he hated the company, wanted to shoot some people, and was obsessed with the thought of killing certain specifically identified co-workers, GSK immediately put Hamrick on paid administrative leave, and thereafter fired him. Hamrick then claimed that GSK had fired him because it had learned that he had initiated a qui tam action accusing GSK of fraud under the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"). Finding that Hamrick had not produced evidence from which a reasonable jury could conclude that GSK had fired him for his whistleblowing, the district court granted summary judgment to GSK. Hamrick appeals this judgment, as well as the district court's decision not to conduct an in camera review of certain documents as to which GSK asserted attorney-client privilege. For the following reasons, we affirm.

## I. Background

In reviewing the district court's summary judgment determination that no rational jury could find that Hamrick's whistleblowing activity was the cause of his termination, we "consider[] the record and all reasonable inferences therefrom in the light most favorable" to Hamrick. Soto-Feliciano v. Villa

- 3 -

<u>Cofresí Hotels, Inc.</u>, 779 F.3d 19, 22 (1st Cir. 2015) (alteration in original) (quoting <u>Estate of Hevia</u> v. <u>Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010)).

During the relevant period, Hamrick worked for GSK in Denver, Colorado, as a senior executive sales representative. In January 2002, as part of an internal investigation into an allegation by another GSK employee, Gregory Thorpe ("Thorpe"), that GSK was illegally marketing pharmaceuticals for off-label uses, Hamrick was called in for an interview with two members of the GSK compliance team. At the interview, Hamrick corroborated Thorpe's allegations. Hamrick also told the compliance team members that he was being treated unfairly and improperly by his managers and co-workers because, in a matter that had nothing to do with off-label marketing, he had reported two co-workers for privately selling a pair of hockey tickets that GSK had intended for use by physicians attending a GSK program. The mistreatment of which Hamrick complained included low performance evaluations, defamatory remarks, and a demotion. Hamrick says that he continued to face retaliation for the ticket incident throughout the spring of 2002, but in the summer of 2002 he canceled a meeting he had scheduled with GSK's Human Resource department to discuss these retaliation claims, indicating that he wished to "drop" the matter.

In January 2003, Hamrick and Thorpe filed (under seal and without service on GSK) a <u>qui tam</u> complaint against GSK under

- 4 -

the FCA, which allows a private citizen whistleblower, called a "relator," to bring certain fraud claims on behalf of the United States in exchange for a portion of the suit's proceeds.  See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 16 (1st Cir. 2009).  The consequent need to cooperate with the Department of Justice added to the strain Hamrick was already feeling because of his mistreatment by co-workers.  As a result, Hamrick says, he began abusing alcohol.[1]  In October 2003, after operating his motorcycle while intoxicated, Hamrick was convicted for Driving While Alcohol Impaired ("DWAI").[2]  This conviction gave Hamrick a "wake-up call" that he "need[ed] some help."  He took a medical leave of absence from work, without reporting his DWAI conviction to GSK.

By late January 2004, Hamrick's psychiatrist had cleared Hamrick to return to full-time employment, and GSK reinstated Hamrick on January 27, 2004.  On February 6, 2004, the U.S. Attorney's Office for the District of Colorado served a subpoena on GSK, putting it on notice that it was under a nationwide federal

---

[1] A later psychiatric evaluation showed that Hamrick "met the criteria for generalized anxiety disorder with many features of posttraumatic stress disorder."

[2] Hamrick was originally charged with Driving Under the Influence, but he was permitted to plead guilty to DWAI instead.

investigation for the off-label promotion of nine of its top-selling products.[3]

On January 29 and February 12, 2004, Hamrick spoke with two HR managers to renew his complaint that he had been suffering unfair treatment because he had reported the 2001 ticket incident. Hamrick was particularly troubled because a co-worker's wife, who worked at Hamrick's son's school, had approached Hamrick's son while Hamrick was on medical leave and asked what would happen if Hamrick lost his job. During these interviews, Hamrick expressed a desire to "'pull out the trachea' of a coworker." After the interviews, the managers voiced concern to GSK's Employee Health Management ("EHM") department regarding Hamrick's "extreme anger in body language, tone of voice, and . . . paranoid ideas." The managers were especially troubled that Hamrick was known to "own[]/carr[y] a gun." Hamrick admits that he made the statement at issue, and that he owned "three or four" guns at the time. After speaking with the managers, the EHM nurse case manager whom GSK had assigned to Hamrick, Marilyn D. Conston ("Conston"), began to arrange a so-called Fitness for Duty Evaluation ("FFD") for Hamrick.[4] About a week later, however, HR contacted Conston and

_____

[3] GSK ended up pleading guilty to the criminal charges brought against it, and it agreed to pay over $1 billion to settle the related civil litigation.
[4] GSK typically required an FFD when GSK needed assurances that an employee who had been on leave was ready to return to work,

requested that she "hold off on scheduling" Hamrick's FFD. HR later informed Conston that it had been "advised by legal" not to move forward with the FFD due to "some issues of a confidential nature" and due to the concern that conducting an FFD "would most likely aggravate the situation."[5]

Meanwhile, Hamrick had been scheduled to attend a GSK-sponsored conference in Dallas from March 15–19, 2004. Prior to the conference, the vice president of HR spoke with corporate security advisor Richard Demberger ("Demberger") about securing security assistance in connection with Hamrick. At the direction of Demberger's boss, Demberger went to Dallas for the conference.

In speaking with various co-workers at the conference, Hamrick made several threatening comments over the course of the week, in some cases while visibly intoxicated. Hamrick's comments included the following:

- "I hate this company. . . . I'd like to take a gun and shoot some people."

- Referring to his former manager, Pat, Hamrick allegedly said, "I want to kill that fucker," before describing his dreams of "jamming his thumbs into [Pat's] eyes and ripping [Pat's] eyes out."

---

although GSK typically did not perform FFDs for employees who, like Hamrick, had already returned to work.

[5] GSK's privilege log reveals that GSK's in-house counsel began communicating with outside qui tam counsel regarding Hamrick's employment issues around this time.

- "I'm fucking crazy. . . . You don't understand, I'm obsessed with these thoughts. Let me give you an example. I'm been [sic] having these dreams where I am in a wrestling match with [GSK managers] Jerry and Pat and I hit Jerry in the eye and his eye pops out and I hit Pat and crush his windpipe."

- "I'd like to fucking kill [Jerry]. No, I wouldn't have any remorse whatsoever. I'd like to kill him."

- When asked about his ex-wife, Hamrick allegedly "started talking about his guns and how his ex-wife was afraid of him now. He talked about cocking the gun and about hollow point bullets. He said he like [sic] to play with the gun when she was around, popping the clip in and out."

While at least one of Hamrick's co-workers did not take the remarks seriously, another expressed significant concern:

> [Hamrick] said words to the effect that if he was going down, he was going to take others with him. . . . My thinking was [that] I just want[ed] to try and say some stuff so he would think I was his friend. It made me think of the situation at Columbine where [school shooter Dylan] Klebold had allowed a student to leave because they were friends.

Hamrick has no recollection of making the statements at issue but does not dispute that he did so. Demberger met with Hamrick at the Dallas conference and asked whether Hamrick thought he had returned from medical leave too soon. Hamrick agreed that he "definitely had some personal issues that [he] was dealing with." GSK required Hamrick to go home early from the Dallas

- 8 -

conference and immediately placed him on paid administrative leave. He would never return to the workplace.

Over the next month, Demberger attempted to negotiate the terms of a severance agreement with Hamrick. Outside of Hamrick's "unique situation," Demberger had never before been involved in severance discussions with employees during his tenure at GSK. Around the same time, GSK learned through an annual audit process about Hamrick's prior DWAI conviction and that Hamrick's driver's license had subsequently been--and indeed remained--suspended. Hamrick, whose job required him to drive an automobile, had not reported the conviction to GSK despite a GSK policy that obliged him to do so.

Meanwhile, Conston rescheduled the FFD that had been stalled prior to the Dallas conference. But the rescheduled FFD was never performed: about one week before the scheduled date, Hamrick wrote to Demberger to propose the terms of a severance package. After an HR manager wrote to Hamrick to reject the proposed terms and to make a counteroffer, Hamrick replied that he had not intended to resign or request severance, indicating that he had compiled his list of proposed terms only "at the insistence and intimidation of Mr. Demberger."

Less than a week later, in mid-June 2004, HR director Bill Reedy ("Reedy") wrote to Hamrick to withdraw GSK's severance offer and to request a meeting to "follow up on the outstanding

issues concerning [Hamrick's] behavior at the sector meeting in Dallas, issues related to [Hamrick's] reported driving record, and to discuss next steps."  It was arranged that Hamrick would meet with Reedy and members of GSK's HR and legal staff later that month to discuss Hamrick's employment issues and Hamrick's knowledge of "inappropriate promotional practices by GSK."  After Hamrick indicated that his attorney would attend the meeting with him, Reedy replied that the attorney "may be allowed to sit in on the interview with GSK attorneys" but would "not be allowed to sit in on the HR portion of the interview with only HR staff," per GSK's standard practice.  The day before the scheduled meeting, Hamrick's attorney left a message with Reedy, saying, "If you are not going to meet with [Hamrick] with me present, I don't think there is going to be a meeting."  Reedy called back the next morning to "confirm that, given [the attorney's] message, it sound[ed] like" the meeting should be canceled.

In early September, after two months of silence, GSK's outside counsel wrote to Hamrick's attorney to renew GSK's request for a meeting and to make clear that if Hamrick refused to discuss his employment issues, "GSK [would] move forward and make an employment decision based on the information the Company [had] already received from others."  Hamrick's attorney replied that Hamrick would attend a meeting if he received written assurances "that a decision [had] not [yet] been made . . . to terminate his

employment, and that no one from GSK [had yet] . . . recommended that he be discharged."  After GSK's counsel indicated that GSK declined to recognize any "'conditions' Mr. Hamrick [sought] to attach to his agreement to cooperate," Hamrick's attorney replied that GSK did not appear to be making a good-faith effort to meet with Hamrick and that the proposed meeting "could potentially involve the discussion of certain issues that Mr. Hamrick is not at liberty to discuss at this time."  Roughly three weeks later, on October 13, 2004, GSK fired Hamrick.

Following his termination, Hamrick amended his qui tam complaint to include an allegation that GSK had fired him in retaliation for his whistleblowing activity, in violation of 31 U.S.C. § 3730(h).  Hamrick's amended complaint was unsealed and served on GSK in July 2012.  In its answer, GSK denied many of Hamrick's allegations, and so the parties proceeded to discovery.  Toward the end of discovery, GSK produced a 57-item privilege log of documents it was withholding on the basis of attorney-client privilege.  Hamrick moved for the district court to compel production of these documents or, in the alternative, to conduct an in camera review of the documents to determine whether GSK had properly characterized them as privileged.  The district court denied this motion without a written opinion.

At the close of discovery, GSK moved for summary judgment.  Assuming that Hamrick had made out a prima facie showing

- 11 -

of retaliation, the district court found that GSK had asserted three legitimate, nonretaliatory justifications for Hamrick's termination: (1) Hamrick's pattern of threatening behavior; (2) Hamrick's failure to disclose his DWAI conviction; and (3) Hamrick's failure to cooperate with GSK's investigation into his conduct. Finding that Hamrick had not produced evidence sufficient for a reasonable jury to find that these asserted justifications were pretextual, the district court granted summary judgment to GSK.

Hamrick now appeals both the district court's decision not to conduct an <u>in camera</u> review of the documents as to which GSK asserted attorney-client privilege and the district court's grant of summary judgment to GSK. We address these matters in turn.

## II.  <u>In Camera</u> Review

## A.    Standard of Review

We review the district court's decision not to conduct an <u>in camera</u> review of the documents on GSK's privilege log for abuse of discretion. <u>See</u> <u>United States</u> v. <u>Zolin</u>, 491 U.S. 554, 572 (1989) ("[T]he decision whether to engage in <u>in camera</u> review rests in the sound discretion of the district court.").[6]

---

[6] GSK contends that Hamrick has waived his request for <u>in camera</u> review because his motion below argued primarily that the district court should compel production of the challenged documents. Hamrick's motion to compel, though, plainly requested

- 12 -

**B.  Analysis**

GSK's log of documents assertedly subject to the attorney-client privilege identifies 56 communications that had been sent to or produced by legal counsel in connection with Hamrick's employment situation.[7]  The log is quite detailed, indicating for each document its date, all authors and recipients, the privilege asserted, and a narrative recitation of the basis for the assertion of privilege.[8]  Hamrick's primary argument for in camera review of these communications focuses on the supposed role of the GSK lawyers involved.  He alleges that the lawyers were acting not as lawyers, but as decision-makers on the business side.  See Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 884 (1st Cir. 1995) ("The attorney-client privilege attaches only when the attorney acts in that capacity.").  GSK counters that there is no reason to suspect that the lawyers were not simply

_____

in camera review as an alternative to compelled production, and Hamrick's arguments in support of his motion to compel apply fully to his less ambitious request that the district court examine the documents in camera to determine whether they had been properly withheld.

[7] One additional logged communication appears not to have been sent to or produced by counsel.  According to the log, it was partially redacted on privilege grounds because it contained a "confidential request for legal advice regarding Hamrick employment issues."

[8]  For example, the narrative recitation for one document reads:  "confidential in-house counsel to outside counsel communication providing information relevant to rendering legal advice regarding Hamrick employment issues."

- 13 -

doing what one would expect: communicating with their client to render legal advice.

The principal weakness in Hamrick's argument arises out of the nature of the business decision at issue: How to deal with an employee who was threatening workplace violence, who might be a qui tam relator, and who may be suffering from a mental disorder? Common sense says that a sophisticated employer would invariably consult closely with legal counsel on such a matter, and that the line between legal advice about what to do and business advice about whether to do it is more abstract than concrete. Indeed, in a case such as this, the legal advice GSK received could well have been to remove Hamrick from the workplace in light of the liability risk he posed.

This is all to say that the circumstances out of which the assertion of privilege arises here present no particular reason to doubt that the lawyers were giving legal advice. The record testimony aligns with this conclusion: GSK witnesses testified that several individuals in management made the decision to terminate Hamrick, and that they did so after soliciting recommendations from legal counsel. In other words, GSK proceeded precisely as one would have expected it to proceed.

Undeterred, Hamrick points to the paucity of any nonprivileged documents concerning the actual decision to terminate him. The inference he draws from this paucity is that

the lawyers, rather than GSK management, must have made the decision.  We find no compelling force in this reasoning.  It is just as likely that management told the lawyers the facts, the lawyers (being lawyers) communicated and documented their advice in writing, and management then conferred without creating any further written record of the decision-making process before signing off on a termination letter to be sent by GSK counsel to Hamrick's counsel.

Hamrick's better arguments are that the number of documents on the privilege log are few (and thus relatively easy to review) and that the evidence suggests that GSK's counsel, claiming privilege, had initially failed to produce one document that was not in fact covered by the privilege and that Hamrick's counsel chanced to hear of at a deposition only because the deponent had used it to refresh her memory.  Whether these points would have justified in camera review is not the issue.  The issue on appeal is whether the district court abused its discretion. And because we "cannot manage the intricate process of discovery from a distance," Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd., 333 F.3d 38, 41 (1st Cir. 2003) (quoting Brandt v. Wand Partners, 242 F.3d 6, 18 (1st Cir. 2001)), we find an abuse of discretion concerning a discovery matter only "upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice,"

- 15 -

id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 186 (1st Cir. 1989)). Given the obviousness of the reasons for Hamrick's firing, and for extensive consultation with legal counsel, we find nothing in the circumstances that would have required a different exercise of the district court's discretion.

### III. Summary Judgment

#### A. Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment de novo, "considering the record and all reasonable inferences therefrom in the light most favorable" to Hamrick. Estate of Hevia, 602 F.3d at 40.

#### B. Analysis

Hamrick's claim of retaliatory discharge under the FCA is governed by the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Harrington v. Aggregate Indus. – Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012). Under this framework, a plaintiff must first make out a prima facie case that an adverse employment action was retaliatory. Id. The burden then shifts to the employer to respond with a "legitimate, nonretaliatory reason" for the action. Id. If the employer successfully does so, "the plaintiff must

assume the further burden of showing that the proffered reason is a pretext calculated to mask retaliation."  Id.

The district court assigned Hamrick the burden of showing that "but for his whistleblowing, he would not have been terminated" (emphasis supplied).  In assigning such a burden to Hamrick, the district court relied on our interpretation of the Fair Labor Standards Act's anti-retaliation provision in Travers v. Flight Services & Systems, Inc., 737 F.3d 144 (1st Cir. 2013).  Travers actually declined to "determine the precise standard of causation applicable" because the parties had agreed to apply the but-for standard.  Id. at 147 n.1.  Here, too, however, Hamrick raises no objection to application of the "but for" burden.  So we again assume without deciding that but-for causation is the correct standard, this time under the FCA.

On appeal, Hamrick also does not dispute that GSK has asserted a proper nonretaliatory justification for his discharge. Therefore, we focus our inquiry on whether Hamrick has adduced "sufficient evidence of 'pretext and retaliatory animus' to make out a jury question . . . as to whether retaliation was the real motive underlying his dismissal."  Harrington, 668 F.3d at 31 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991)).  Affirmance is warranted only if no reasonable jury could find that Hamrick would have kept his job had GSK not been motivated to retaliate against him.

- 17 -

In considering what a reasonable jury might find in this case, the gravity of the conduct to which GSK points as its principal reason for discharging Hamrick leaves Hamrick with little hope of successfully launching any alternative theories of causation absent some evidence that he did not make the threats ascribed to him or that his behavior should be viewed in a different light. He offers neither. Instead, his principal argument is that because GSK did not deal with him more harshly and rapidly, a reasonable jury could conclude that GSK's professed concern for workplace safety was merely an "after-the-fact justification[]" for a retaliatory termination. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000).

Along these lines, Hamrick argues that if the true reason for his termination was his threat of violence, GSK would have called security to investigate the matter more promptly and thoroughly. The fact is, though, that GSK sent a security officer to the Dallas conference and, immediately following the incident in Dallas, GSK sent Hamrick home and placed him on administrative leave--and at no point thereafter invited him to return to the workplace.[9]

---

[9] Even while arguing that GSK's response was too lethargic to signal genuine concern, Hamrick highlights the fact that one of his co-workers did not take his violent remarks seriously and so suggests that GSK's response was heavy-handed--and therefore disingenuous. But Hamrick's conduct certainly made some GSK employees considerably uneasy. A jury's suspicions could hardly

In the same vein, Hamrick finds it peculiar that he was not finally terminated until seven months after the incident in Dallas. But Hamrick himself points out (and, inconsistently, attempts to draw suspicion from) the fact that GSK initiated efforts to negotiate a severance agreement immediately upon Hamrick's return from Dallas and only began the investigatory process that would conclude with Hamrick's termination after those negotiations had broken down. Moreover, once GSK had neutralized any threat Hamrick posed at GSK by removing him from the workplace, the need for urgent action had passed; GSK could then afford the time required to make sure that it had the facts straight, to give Hamrick a chance to meet, and to navigate the difficulties of terminating a long-term employee with a history of internal whistleblowing and possible signs of mental illness.[10] In sum, we fail to see how a jury could find in Hamrick's termination process

---

be roused by the fact that GSK erred on the side of caution. And insofar as Hamrick argues that "[i]t is for the jury to hear from [his co-workers] in their own words and weigh them--along with [Hamrick's own] testimony," he misunderstands the nature of our inquiry. Whether Hamrick's co-workers responded reasonably to Hamrick's undisputed conduct in Dallas is not before us; our question is whether Hamrick has offered any reason for a jury to suspect that GSK's response to the information it received about Hamrick's conduct was insincere. He has not done so.

[10] In light of these difficulties, Reedy's testimony that there would have been a "potential path back to work for Hamrick" had Hamrick been "sufficiently cleared of policy violations" is entirely unremarkable.

evidence that GSK was not as concerned as any reasonable employer would be about Hamrick's potential for violence.

Hamrick next argues that his conduct in Dallas was itself a result of GSK's retaliatory animus. In the modest version of this argument, Hamrick merely contends that his violent outbursts arose from the emotional strain caused by GSK's acts of retaliation. This version suffers from evidentiary and temporal difficulty, however. Although Hamrick repeatedly complained of retaliatory treatment prior to the meeting in Dallas, up to a month before the meeting Hamrick attributed this alleged retaliation to his exposure of his co-workers' improper sale of a pair of hockey tickets--an incident entirely unrelated to Hamrick's FCA-protected activity.[11] Hamrick himself observes that it was not until GSK's receipt of a subpoena in early February 2004--roughly a month prior to the Dallas meeting--that "the record supports a reasonable inference that GSK suspected Mr. Hamrick of being a relator." Since Hamrick alleges no specific incident of retaliation occurring between GSK's receipt of the subpoena and the Dallas

---

[11] Hamrick asserts that the alleged ticket-related retaliation is nonetheless "significant because [it] set[s] the stage" for GSK's alleged whistleblowing-related retaliation. What Hamrick means by this, he does not make clear. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (undeveloped argument deemed waived). Because we draw no relevant inferences from GSK's alleged pattern of conduct surrounding the hockey ticket incident, we need not consider GSK's argument that Hamrick disavowed any reliance on this pattern of conduct below.

meeting, no jury could infer from the record that Hamrick's conduct in Dallas resulted from any relevant retaliation.

Facing these evidentiary shortcomings, Hamrick doubles down with a more ambitious claim--that "GSK sent a vulnerable Mr. Hamrick to Dallas anticipating that something untoward might happen." On Hamrick's telling, GSK recognized that Hamrick was unstable upon his return from medical leave[12] but, after coming to suspect that Hamrick was a whistleblower, "decided to simply sit back and wait for Mr. Hamrick to . . . provide . . . an excuse to terminate him." Hamrick is driven to such a theory by an inconvenient fact--that during the period immediately following GSK's receipt of the subpoena, GSK took no action consistent with a desire to push Hamrick out.[13] In any event, the theory is both speculative and farfetched. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."). And the fact remains that Hamrick did

---

[12] That GSK was aware of Hamrick's instability is amply supported in the record, both in light of HR's notes from the interview in which Hamrick expressed his desire to rip the trachea from his co-worker and in light of the steps HR took to ensure a security presence at the Dallas meeting.

[13] By Hamrick's own testimony, his invitation to attend the Dallas conference was an unremarkable incident of his position as a respiratory sales representative.

indeed provide a compellingly good reason to be removed from the workplace.

Also undisputed is the presence of an additional nonretaliatory basis for GSK's decision to terminate Hamrick-- Hamrick's DWAI conviction and subsequent failure to report it as required by GSK policy.[14] Although Hamrick correctly notes that an unreported DWAI is not an "automatically . . . fireable offense," he ignores the cumulative weight of his offenses. Given undisputed testimony that Hamrick could have been terminated for the DWAI offense alone,[15] a reasonable jury faced with such an offense on top of Hamrick's other serious misconduct could hardly conclude that GSK would have retained Hamrick had he not been a relator.

Hamrick nevertheless tries to argue that the timing of the breakdown in severance discussions raises a question about the

---

[14] Hamrick alleges that his physician had advised him not to report the conviction. But Hamrick did not offer this excuse to GSK except through a letter from his attorney devoid of any supporting documentation. Moreover, Hamrick gives us no reason to suspect that the excuse, if shown to be true, would have been relevant under GSK's disciplinary policies.

[15] GSK's Safe Driver Policy indicates that termination is possible where "driving restrictions prohibit performing essential functions of the job for an unreasonable period of time." Although Hamrick avers that the DWAI conviction "[a]t no time . . . impact[ed] his ability to drive for work," the record suggests otherwise. Hamrick's driver's license was suspended soon after his conviction, and it remained suspended, five months later, when HR reviewed Hamrick's driving record and expressed surprise that Hamrick had been "driving on [a] suspended license."

bona fides of GSK's asserted reasons for firing him.  We do not see how this is so.  Hamrick did not, as requested, meet with HR following the breakdown of severance negotiations to explain his misconduct.[16]  Hamrick asserts that it was Reedy who canceled the first proposed meeting, but it was Hamrick's lawyer who, after discovering that he could not sit in on the HR portion of the meeting per GSK's standard practice, left a message with Reedy to say, "I don't think there is going to be a meeting."  Reedy merely "confirm[ed] that, given [the lawyer's] message, it sound[ed] like" the meeting should be canceled.  When GSK again requested a meeting, Hamrick again attempted to impose conditions.  On GSK's third attempt to initiate a meeting, Hamrick failed to take up the invitation.  At the close of this process, Hamrick was terminated on the basis of the information HR had before it, which included Hamrick's conduct in Dallas and his unreported DWAI conviction.  Although Hamrick defends the cat-and-mouse game he played in trying to impose conditions upon the proposed meetings, he offers no

---

[16] Hamrick argues that GSK has only post hoc asserted a failure to cooperate as a basis for his termination and that a jury could therefore infer that GSK is hiding its actual rationale.  This argument represents a change of tune from Hamrick's complaint, which cited failure to cooperate as one of the "reasons upon which GSK . . . allegedly relied when it made its decision to discharge." And such an argument would be meritless in any event.  At the time HR sought to meet with Hamrick, it clearly indicated that Hamrick's failure to cooperate would cause GSK to "move forward and make an employment decision based on the information the Company [had] already received from others" about Hamrick's underlying misconduct--which is precisely what happened.

evidence suggesting that GSK's refusal to entertain these conditions deviated in any way from the norm.[17]

Unable to undermine GSK's nonretaliatory account in any convincing way, Hamrick next attempts to create a jury question by conjuring up a "plausible competing" account. In this account, GSK began its campaign of retaliation immediately after Hamrick first corroborated Thorpe's claims of off-label branding during GSK's internal investigation in January 2002. This retaliation escalated after GSK received a subpoena in February 2004 and began to suspect that Hamrick was a relator. Following the Dallas conference and the breakdown of severance negotiations, GSK's suspicions were further stirred when it learned that Hamrick was represented by Keith Cross ("Cross"), the same employment and qui tam attorney who had previously represented Thorpe during Thorpe's severance negotiations. Finally, once Cross "effectively confirmed" to GSK that Hamrick was a relator in a September 24, 2004, letter, GSK took the final step of terminating Hamrick nineteen days later.

This narrative has too much fiction and too little fact. Hamrick himself admitted that the alleged retaliation by co-workers predated his January 2002 corroboration of Thorpe's off-

---

[17] To the extent that GSK argued below that Hamrick's failure to complete an FFD constituted an additional failure to cooperate, GSK has since disavowed any reliance on the argument, and we do not consider it.

- 24 -

label branding allegations, and he has disavowed any argument that this corroboration formed a basis for the alleged retaliation here.[18]  We observe, moreover, that GSK's conduct upon receiving the subpoena in February 2004--deciding not to require Hamrick to undergo an FFD and allowing Hamrick to attend the Dallas conference despite GSK's concerns about his mental health--does not suggest retaliatory animus.

Undaunted, Hamrick insinuates that Demberger's atypical involvement in the severance negotiation process betrays such animus.  Hamrick is certainly correct that "deviations from standard procedures" can "give rise to an inference of pretext." Harrington, 668 F.3d at 33.  But merely identifying some unusual measure GSK has taken--particularly bearing in mind the unusual facts of Hamrick's misconduct--is insufficient, without more, to create such an inference.[19]  See Abril-Rivera v. Johnson, 806 F.3d

---

[18]  Hamrick briefly suggests that GSK previously "pushed" Thorpe "out of the company" for Thorpe's whistleblowing activity, and that this evidence of past retaliation supports a finding of retaliation here.  Hamrick, though, points to no admissible evidence that actually supports the claim that GSK forced out Thorpe, citing only an allegation by Thorpe's counsel and an email by an HR consultant recommending that GSK accept Thorpe's own request for a severance package.

[19]  Hamrick's further suggestion that Demberger "might have been receiving his instructions from GSK's legal department" misconstrues Reedy's testimony that the legal department, naturally enough, "would have been involved in any conversation around severance."  In fact, Reedy explicitly testified that the person instructing Demberger "would have been somebody in HR." This testimony aligns with Demberger's own.

599, 610 (1st Cir. 2015) (evidence of departure from standard procedure insufficient to create jury question where "the record discloses no shifting explanations for deviations from protocol or improbable 'coincidences'"). For the same reason, we find no significance in GSK's failure, following the breakdown of severance negotiations, to revive its efforts to conduct an FFD. As Hamrick's own counsel has noted, GSK refused to confirm that Hamrick had any options other than termination after Dallas, barring his "clear[ance] of policy violations," and one cannot imagine why GSK would have continued to seek an FFD after Hamrick broke off severance discussions and soon thereafter proved unwilling to participate in the investigatory process that represented his only conceivable hope of clearing himself.

Similarly, GSK's conduct upon learning that Cross was representing Hamrick does little to suggest retaliation. Hamrick first contends that the revelation of Cross's identity was the "real reason" Hamrick's scheduled meeting with Reedy was cancelled. Beyond the fact that it was Cross who first suggested that the meeting should not go forward, Reedy had already made the unwelcome conditions of the meeting clear before Cross identified himself. Hamrick next argues that GSK proposed to discuss off-label branding following the identification of Cross in order to learn whether Hamrick was a relator, but Reedy had requested to speak with Hamrick about his misbranding allegations prior to any

- 26 -

communications from Cross. Hamrick then attempts to raise suspicion from GSK's two-month silence following Cross's first communication to GSK, but he identifies nothing in the process following this silence that would cause a reasonable jury to infer that anything had been amiss in the interim.[20] And when GSK did respond, the fact that it elected to do so through its own outside counsel is hardly eyebrow-raising.[21]

Finally, Hamrick returns to a truncated version of his competing narrative, pointing to the fact that the ultimate notice of termination came only nineteen days after Cross supposedly confirmed Hamrick's role as a relator by indicating to GSK in a September 24, 2004, letter that Hamrick "was not at liberty to discuss" off-label branding. See Harrington, 668 F.3d at 33 ("[C]lose temporal proximity between relevant events" can "give

---

[20] Hamrick cites to Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19 (1st Cir. 2015), for the proposition that "gaps in the defendants' account . . . raise a genuine issue of material fact concerning pretext," id. at 29. Soto-Feliciano, however, referred to an employer's contemporaneous silence as to instances of misconduct that the employer later cited as reasons for an employee's termination; it did not hold that a period of inactivity by itself creates a jury question.

[21] Hamrick objects that GSK initiated contact not through an employment attorney but through its outside "qui tam counsel," who had been in contact with GSK about Hamrick's employment situation since Hamrick's return from medical leave in February 2004. We agree that the involvement of qui tam counsel supports an inference that GSK suspected Hamrick might be a relator. The availability of such an inference, while likely required to support a retaliation claim, is not by itself sufficient to establish a jury question as to pretext, especially where a fully independent and compelling reason for the action exists.

rise to an inference of pretext.").  Putting aside the fact that Cross had already informed HR three months prior that Hamrick "[wouldn't] be able to answer any questions on" off-label promotions, Hamrick's temporal nexus claim fails for an even more obvious reason: Hamrick had already been on the path to discharge for at least five months prior to the "implicit confirmation" on which he now relies.  While Hamrick was indeed terminated nineteen days after Cross's communication, what Hamrick fails to mention is that he was fired thirteen days after he failed to meet a final deadline for responding to charges of extreme misconduct--a deadline that had been set before Cross sent his letter.  No reasonable jury could believe that Cross's last-minute letter was a factor in Hamrick's termination.

In sum, GSK's straightforward narrative coheres nicely with the record: Following Hamrick's return from medical leave, he exhibited renewed and even more serious signs of instability and homicidal ideation, which manifested themselves in a series of graphic threats at a conference in Dallas, giving rise to reasonable concerns about workplace violence.  GSK promptly removed Hamrick from the workplace and began severance negotiations.  When those negotiations broke down, GSK sought a meeting with Hamrick to discuss his serious misconduct, as well as an independent violation of GSK's Safe Driver Policy that had since come to light.  After Hamrick exhibited unwillingness on three

occasions to participate in such a meeting on GSK's standard terms, GSK terminated him. While the imagination of skilled counsel might have been sufficient to raise an inference of pretext in the face of a less cogent and compelling explanation for Hamrick's termination, no reasonable jury could in this case be swayed by Hamrick's largely speculative attempts to dislodge GSK's asserted motivation from its grounding in the record evidence. If his role in the qui tam action played any role in his termination, perhaps it caused GSK to tread more carefully and slowly than it otherwise might have before striking the final blow. No reasonable jury, though, could find that the qui tam action was GSK's reason for terminating Hamrick.

## IV. Conclusion

Finding that the district court did not abuse its discretion in declining to conduct in camera review of the items on GSK's privilege log, and finding that the district court properly granted summary judgment to GSK, we affirm the rulings below.

- 29 -