In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3630

MOLLY JOLL,

*Plaintiff-Appellant*,

*v.*

VALPARAISO COMMUNITY SCHOOLS,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:16-cv-00338-JEM — **John E. Martin**, *Magistrate Judge*.

ARGUED DECEMBER 4, 2019 — DECIDED MARCH 20, 2020

Before FLAUM, RIPPLE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Molly Joll is an accomplished runner and an experienced running coach. She applied for a job as the assistant coach of a high school girls' cross-country team. The high school hired a younger man for the job but invited Joll to apply for the same position on the boys' team. So she did—and the high school hired a younger man again. She filed this suit for sex and age discrimination. After discovery, the district court granted summary judgment

for the school district, concluding that Joll had not offered enough evidence of either form of discrimination to present to a jury.

We reverse the dismissal of Joll's sex discrimination claim. The district court appears to have erred by doing what we have repeatedly said a court should not: "asking whether any particular piece of evidence proves the case by itself," rather than aggregating the evidence "to find an overall likelihood of discrimination." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763, 765 (7th Cir. 2016). Joll offered evidence that would allow a reasonable jury to find that the school district used hiring procedures tilted in favor of the male applicants, applied sex-role stereotypes during the interview process, and manipulated the criteria for hiring in ways that were inconsistent except that they always favored the male applicants. A reasonable jury might also find no sex discrimination, but on this record, the decision belongs to a jury.

I.  *Facts for Summary Judgment*

We state the case in the light reasonably most favorable to Joll, giving her the benefit of conflicts in the evidence and reasonable inferences from the evidence, but without vouching for the objective truth of any fact or expressing any opinion on the weight of the evidence. *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014); *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

Defendant Valparaiso Community Schools operates Valparaiso High School and Thomas Jefferson Middle School, two public schools in northwestern Indiana. Joll has been a teacher at the middle school for more than twenty-five years.

For twelve years, from 2005 to 2013, she co-coached the middle school boys' and girls' cross-country team. In 2013 she resigned the middle school coaching position to better support her two daughters in their high school and college running careers. "It wasn't fair" to the cross-country program, as Joll thought and explained at the time, for her to divide her time between the program and her daughters.

By 2014 her older daughter's running career had come to a close, so Joll again had the time to devote to coaching. Her old position at the middle school had been filled, but the high school was hiring an assistant coach for the girls' cross-country team. On June 17, Joll sent letters of interest in the position to high school principal Reid Amones and high school athletic director Herb Hofer. That was "the normal process" for applying, according to Hofer.

At first Joll heard nothing back. Around the end of June, she emailed Hofer and enlisted the help of her union president and vice-president. Finally, on July 3, Joll received a text message from the girls' head coach, Adam Nellessen, asking whether she would be available for an interview two days later, on July 5. Joll said she would be. While athletic director Hofer ordinarily would have conducted the interview with coach Nellessen, knee surgery prevented Hofer's attendance on July 5. His place was taken by principal Amones.

Normally, according to Hofer, interviewers would ask applicants "what their qualifications are," "what experiences they have, what drew them to the job." Joll has substantial experience both as a coach and as a runner herself. She ran cross-country and track all four years of high school and attended Indiana State University, an NCAA Division I school, on a full

athletic scholarship for both sports. After receiving her master's degree in education, Joll spent about five years as the girls' track coach at a junior high school in central Indiana, with a one-year stint as a volunteer track coach at a school in the United Kingdom as part of a Fulbright teachers' exchange program.

Joll then began her more than twenty years with Valparaiso Community Schools and its athletics programs. From 1991 to 1995, Joll was the assistant girls' track coach at Valparaiso High School; she was the co-coach of the girls' track team at Thomas Jefferson Middle School from 1995 to 2005. For part of the same period, from 1994 to 2004, she was an assistant women's and men's cross-country coach at Valparaiso University, also a Division I school. Finally, as mentioned above, Joll co-coached the middle school's cross-country team from 2005 until 2013, when her daughters' athletic careers led her to resign that position. Throughout this period Joll also coached a local youth running club as a volunteer.

There is no evidence, however, that this wealth of experience was discussed much during Joll's July 5, 2014 interview with coach Nellessen and principal Amones for the position with the high school girls' team. Rather, Joll fielded questions about resigning her middle school coaching position in 2013 and whether her parenting duties would permit her to devote sufficient time to coaching at the high school. She was emphatic that they would.

Given Joll's 2013 resignation from the middle school coaching position, such questions might have seemed unremarkable. In this case, however, the only other applicant was John Arredondo, a forty-year-old man who was eventually hired for the position. Arredondo had also resigned a cross-

country coaching position in 2013 for family reasons. During his interview with Nellessen and Amones, however, Arredondo was not asked about his family life. He was asked instead about his "coaching experience, what my coaching philosophy is, a lot of shop talk." In other words, the three men "talked shop." Joll had to talk parenting.

The differences in the high school's hiring process did not end there. According to athletic director Hofer, the school's ordinary course was to check an applicant's references only after the decision had been made to recommend his hiring to the school board, the school district's final decision-maker on personnel matters. That is how the school proceeded with Arredondo. Joll's references, however, were contacted within days of her interview on July 5.

The high school heard from at least three of Joll's seven references. Two gave her unqualified recommendations, submitting lengthy narratives praising her as a "respected leader" and a "great role model." Aaron Crague, head coach of the high school's boys' cross-country team, whom Joll had coached when he was a student-athlete at Valparaiso University, pointed to Joll's "authentic knowledge gleaned" as a runner herself. He said "she would do a fine job collaborating with Coach Nellessen." It had been Crague's experience that Joll had "always done a great job supporting and complimenting [*sic*] the head coach."

A third reference was generally strong but less favorable on the latter point. Jim Polite, the middle school's principal, opined in a brief, three-point email to Amones that Joll's fitness to serve in a subordinate role "would be my only concern." Joll, thought Polite, "has a dominate [*sic*] personality." (The parties assume he meant "dominant personality.")

Amones forwarded Polite's email to Hofer with the one-sentence comment, "The 3rd one I got," seemingly referring to the "dominate personality" comment, the third of Polite's comments.

On July 18, Hofer called Joll to tell her the school had chosen Arredondo because he had "more current experience working with high school age athletes." That was true as far as it went, despite Joll's much more extensive experience as a coach and runner. Arredondo had coached the boys' cross-country team at a different high school outside the school district from 2008 to 2013. Joll had last professionally coached high schoolers in 1995. There is no evidence of how the difference between middle school and high school athletes or between high school and college athletes was material to the assistant coach position, and Polite saw "no reason" why Joll's middle school experience "wouldn[']t translate to the HS level."

In the meantime, Joll had learned that there would also be a not-yet-publicized opening for an assistant coach of the boys' high school cross-country team. She told athletic director Hofer that she intended to apply for that position as well. Around the end of July, Joll received a message from Crague, the boys' head coach, asking her to interview for the position on the boys' team.

The interview was conducted by athletic director Hofer and coach Crague. Again Joll was called on to convince her interviewers that she was willing to devote the necessary time to coaching, notwithstanding her family responsibilities. Again there is no evidence she was asked to "talk shop" with the two men interviewing her. Again Joll lost out to a younger man who was the only other applicant, a twenty-eight-year-

old named Ben Kerezman. Again Joll's references were handled differently than the successful applicant's. Kerezman's references were not checked at all because, according to Hofer, "he was a teacher within our system" (so was Joll) and because Hofer knew him personally (as Crague knew Joll personally; he had been a reference for her for the girls' team job).

Unlike Arredondo, Kerezman did not have more recent professional experience coaching high school cross-country runners compared to Joll. But for this hiring decision, recency of professional experience with high school athletes was no longer the relevant criterion. Instead, Hofer told Joll at the time, Kerezman had been preferred because he had "better rapport with the boys." Kerezman was a teacher at the high school and so, says the school district, "was familiar with many of the cross-country [team] members," though there is otherwise no evidence of what Kerezman's "rapport with the boys" was.

There is also no evidence and no explanation why "rapport with the girls" did not assume similar importance in hiring the assistant for the girls' team. That would have been bad for Arredondo and good for Joll: Arredondo was a teacher at an out-of-district high school whose only opportunity to build "rapport with the girls" had been a five-week stint as a volunteer coach on the girls' team beginning June 2014, just before he was hired. Joll, on the other hand, had coached many of the high school runners, both boys and girls, as middle schoolers.

As it turns out though, "rapport with the boys" may not actually have been all that relevant to Crague and Hofer's decision about the boys' team. Rather, Hofer later testified, the "only factors" considered in hiring the boys' assistant were "being a teacher within the building, the HS building," and

"recent coaching experience in the high school ranks." At least with respect to professional coaching (both Joll and Kerezman had recent volunteer experience with high school cross-country runners), the latter cannot be squared with the school district's own account of Kerezman's resume, nor with Hofer's own statement that "coaching experience" was not considered in the hiring process "because we already decided from working in the building as being [*sic*] a very valuable thing for our program."

As for "being a teacher within the building," as with "rapport," there is no evidence or explanation why the putative single most important qualification for the boys' assistant apparently played no role at all in hiring the girls' assistant. Again that would have been bad for Arredondo and good for Joll. Though neither taught at the high school, Joll at least taught within the school district and as noted had already coached many of the high school runners as middle schoolers.

In July 2016, Joll brought this suit against the school district in the Northern District of Indiana alleging violations of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. The district court had jurisdiction under 28 U.S.C. § 1331. Magistrate Judge Martin heard and decided the case with the parties' consent under 28 U.S.C. § 636(c)(1). After discovery, the court granted defendant's motion for summary judgment on both counts of the complaint and entered final judgment against Joll. After the court denied her motion to reconsider, Joll appealed. We have jurisdiction under 28 U.S.C. § 1291.

II. *Analysis*

We review the district court's grant of summary judgment de novo. *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014). Summary judgment is appropriate if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Garofalo*, 754 F.3d at 430. The maxims of summary judgment are familiar—no weighing the evidence, no credibility determinations, draw all non-speculative inferences in favor of the non-movant—but they are more easily recited than applied. *Johnson v. Advocate Health and Hosp. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018). They define the outer limits of Joll's right to "the commonsense judgment of [her] community," *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975), and to the generous latitude the court accords it. We entrust a great deal to the jury's human experience: that "strong drink strips the mind of its pretences and brings out into the open what is hidden in a man's heart," for example, *United States v. Bloch*, 718 F.3d 638, 643 (7th Cir. 2013); that four days shackled to the wall of an interrogation room is unreasonable policing, *Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006); that "a 16-year-old girl in the company of three adult men" is "the least likely of the four to be carrying … heavy handguns." *County Court v. Allen*, 442 U.S. 140, 163–64 (1979). We allow a jury to infer a great deal without mathematical precision. *Standard Oil Co. v. Van Etten*, 107 U.S. 325, 334 (1882). "It is always possible for … logicians to examine what appears to be a reasonable inference and to show how that inference is actually the sum of several shorter inferential steps," but it "would ignore common sense" to prohibit all inferences "except those which cannot be broken down any further." *United States v. An Article of Device*, 731 F.2d 1253, 1263 (7th Cir. 1984). In short, trials are stories, not

syllogisms. *Old Chief v. United States*, 519 U.S. 172, 187–89 (1997). Accordingly, the court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation.

Before answering that question here, however, we try to clear up some confusion that has so far affected the arguments in this case.

A. *Scope of Review*

When the school district moved for summary judgment, it addressed essentially the same arguments to both of Joll's claims for sex and age discrimination, arguing that both claims were subject to the same standard and analysis and that both failed to satisfy the familiar standard, stemming from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Joll might have opposed the motion in part by pointing out that the *McDonnell Douglas* test is only one means, not an end in itself; that Title VII and ADEA causation standards are not always the same because of the availability of mixed-motive claims under Title VII but not the ADEA; and that determining whether one factor was causal demands a different factual analysis than determining whether a different factor was causal.

That is not how Joll argued the case in the district court. Instead, her opposition picked up where the school district left off—without distinguishing between Title VII and the ADEA or between sex and age. She argued that evidence of sex stereotyping and pretextual justification presented triable issues under *McDonnell Douglas*, with one fleeting reference to "mixed-motives." See *Gross v. FBL Fin. Servs., Inc.*, 557 U.S.

167, 173–76 (2009) (Title VII allows "mixed-motive" claims, but with limited remedies, while ADEA requires plaintiff to prove "but-for" causation).

On appeal, Joll has spent a good bit of energy arguing that the district court "improperly applied the outdated *McDonnell Douglas* framework to this mixed motive case of sexual [*sic*] discrimination." This assertion is triply curious given Joll's exclusive reliance on that same framework at summary judgment, its plaintiff-friendly operation in the ordinary case, and our recent reaffirmation of its continuing vitality. See *Ortiz*, 834 F.3d at 766. In any event, Joll's waivers "in the truest sense" here and in the district court, *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012), preclude our review of the ADEA claim at all and of the Title VII claim under a mixed-motive standard. We are left with her argument on appeal that a reasonable jury could find Joll would have been hired as an assistant cross-country coach if she were male "and everything else had remained the same." *Ortiz*, 834 F.3d at 764. On that score, we agree with Joll.

B. *Title VII*

In general, Title VII prohibits intentional discrimination in employment on the basis of statutorily proscribed factors, including sex. 42 U.S.C. § 2000e-2(a)(1); *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 877 (7th Cir. 2014); *Atanus v. Perry*, 520 F.3d 662, 671–72 (7th Cir. 2008). In this case, as in many discrimination cases, "the sole question that matters" is causation: whether a statutorily proscribed factor caused a failure to hire. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016). Direct as well as circumstantial evidence may support an inference of causation, and thus intent. *Id*. at 764; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "To clarify

and to simplify" her task, a plaintiff may choose to enlist the burden-shifting framework of *McDonnell Douglas*. *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring); accord, *Ortiz*, 834 F.3d at 766.

"In order to make out a case of sex discrimination without resorting to *McDonnell Douglas*, a plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). We have identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment. *Troupe*, 20 F.3d at 736. Joll has offered some of each type. Taken together, her evidence would permit a reasonable jury to infer "an overall likelihood of discrimination" that merits a trial, not summary judgment. *Ortiz*, 834 F.3d at 763.

A jury could reasonably infer that athletic director Hofer and principal Amones simply did not want to hire a woman for either assistant coach position, and that they did what they could, short of admitting it, to ensure that the only woman applicant would not be hired. (Employers long ago "taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written." *Troupe*, 20 F.3d at 736.) Looking at the evidence as a whole, as we must, a jury

could reasonably find that Hofer and Amones bent the rules in Arredondo and Kerezman's favor and to Joll's detriment.[1]

We can begin with differential treatment in the selection process itself. Joll had trouble simply securing an initial interview for the girls' job, suggesting a baseline reluctance to entertain her candidacy. After the interview, her references were contacted sooner than was ordinary (with important consequences for her), while Arredondo's were contacted later, as was usual, and Kerezman's not at all—suggesting a higher baseline of scrutiny for Joll.

---

[1] We agree with the dissenting opinion that discrete adverse employment actions give rise to discrete claims that must be evaluated individually. Post at 32. The jury accordingly may find the school district liable for one, both, or neither of the two failures to hire alleged here. Nevertheless, the closeness in time and the similarity of the positions permit, indeed invite, a useful comparison between the two hiring processes in determining what inferences the evidence reasonably permits.

As for the identity of the decisionmaker, see post at 32 n.2, the record permits the reasonable inference that Hofer and Amones made both hiring decisions, with Hofer as the more active partner. Though there is a bit of conflicting evidence on this point, some of which is pointed out below, according to the school district the hiring decision for the girls' position "was made by" Nellessen, Hofer, and Amones; the hiring decision for the boys' position "was made by" Hofer and Crague. While Amones filled in for Hofer at the interview for the girls' position, it was usually Amones's more limited role to approve and forward Hofer's hiring recommendations to the school board. With respect to the head coach's usual role, Hofer's testimony that a head coach had "never" disagreed with his hiring recommendation suggests the decision was effectively Hofer's, subject generally to Amones's approval and, exceptionally in this case, his somewhat greater involvement in hiring the girls' coach.

Evidence about the interviews does not require, but certainly permits, an inference that the decision-makers were indulging sex-role stereotypes as they approached the decisions. As Joll told the school district at the time, she resigned the middle school position in 2013 precisely from a desire not to give the program less than its due. Yet her 2014 declaration of full commitment to coaching was met with skepticism and discounted. Job interviewers are of course entitled to probe applications in relevant ways, and they are not required to take an applicant's answers at face value. Those questions by themselves would not necessarily show bias. But the telling twist in this case is that, although family matters had recently prompted his resignation from a similar position, Arredondo's commitment was not questioned. He "talked shop," not kids, with the interviewers.

Basing an employment decision on an employer's notions of how women do or ought to behave—the employer's sex-role stereotypes—is discrimination "because of sex." See *Hively v. Ivy Tech Comm. Coll. of Ind.*, 853 F.3d 339, 345–47 (7th Cir. 2017) (en banc), discussing among others *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). The notion that a woman is or ought to be dedicated to family above work is one long-standing such stereotype. *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 731, 736 (2003) (holding FMLA family leave provision validly abrogated state sovereign immunity: "pervasive sex-role stereotype that caring for family members is women's work," in turn "foster[ing] employers' stereotypical views about women's commitment to work and their value as employees").

A jury could find that the interviewers' questions, at least when they were asked only of Joll and not of a similarly situated male applicant, reflected such stereotyping. See *Lust v. Sealy, Inc.*, 383 F.3d 580, 583 (7th Cir. 2004) (sustaining jury verdict for plaintiff: "Most important, Penters admitted that he didn't consider recommending Lust for the Chicago position because she had children and he didn't think she'd want to relocate her family, though she hadn't told him that."); *Bruno v. City of Crown Point*, 950 F.2d 355, 362 (7th Cir. 1991) (reversing jury verdict on other grounds, but acknowledging: "The fact that Pyle asked only Bruno family-oriented questions reveals that those questions were based on sex stereotypes—namely, that females are the primary care providers for children … ."); *id*. at 365 (Easterbrook, J., dissenting) ("paternalistic questions" about husband's views of job application and plans to have additional children supported inference of sex discrimination so that verdict should have been upheld).

As noted, Joll's references were contacted more quickly than usual. A jury could find that this deviation from standard procedures also lends support to her claims. See, e.g., *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) (reversing summary judgment); *Coleman*, 667 F.3d at 858 (reversing summary judgment; explaining that selective enforcement of company policy can establish pretext); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891–92 (7th Cir. 2001) (same); see also *United States ex rel. Hamrick v. GlaxoSmithKline LLC*, 814 F.3d 10, 22 (1st Cir. 2016) ("[D]eviations from standard procedures can give rise to an inference of pretext.") (quotations omitted); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992) (affirming jury verdict for age-discrimination plaintiff where

employer fired him without following its standard proce-dures, including helping employees overcome deficiencies), citing among others *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) ("departure from internal hiring procedures is a fac-tor that the trier of fact may deem probative").

With respect to the references, a jury could find further ev-idence that the school district strained to reject Joll's applica-tions based on sex-role stereotypes. The decision-makers dis-counted the two long and positive narratives from a runner coached by Joll and from Crague, the head coach of the high school boys' team (whose opinion, recall, was that Joll had "always done a great job supporting and complimenting [*sic*] the head coach"), in favor of middle school principal Polite's isolated comment that Joll has a "dominate personality."

A jury could think that Polite's phrase was an odd way to say "insubordinate," if that was what was understood. In-deed, at the risk of indulging in some other stereotypes, it's easy to think that a dominant personality is often viewed as a *virtue* of at least male athletic coaches. The point is not that the school district hired "dominant" male coaches but not "dom-inant" female coaches. The point is that a jury could draw on its experience to conclude that the same behavior may be la-beled "assertive" in a man and "aggressive" in a woman. In other words, a reasonable jury could conclude that Joll was being penalized for transgressing the age-old stereotype that women are or ought to be submissive. See *Hopkins*, 490 U.S. at 250 (plurality) ("[A]n employer who acts on the basis of a be-lief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."); 29 C.F.R. § 1604.2

("Such stereotypes include, for example, … that women are less capable of aggressive salesmanship.").[2]

A jury could infer further that the signal was received immediately by principal Amones and athletic director Hofer ("The 3rd one I got.") and operated so powerfully that it overrode the contrary opinion of coach Crague (who would have been the one to deal with any insubordination or "domination" by Joll, at least on the boys' team) and even the more complete and balanced opinion of Polite, which was that if Joll "already has a good relationship with the head coach," as she did with Crague, "it would probably be fine." Of course, we agree with the dissenting opinion that a jury could reasonably conclude that what we have characterized as evidence of sex-stereotyping was in fact entirely innocent conduct. Some ambiguity inheres in all employer remarks that fall short of admitting discrimination while still supporting an inference of it. This ambiguity is the very reason the jury must be called. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044–45 (7th Cir. 1999) (affirming plaintiff's verdict for pregnancy discrimination; jury was not required to accept proffered innocent interpretation of remarks that could also be understood as reflecting sex-role stereotypes).

The evidence reviewed so far is sufficient to warrant a trial, but there is more support from comparing the hiring criteria for the boys' and girls' team jobs. The defendant's stated

---

[2] In the district court and on appeal, the parties have argued a good deal about Joll's proffered expert on implicit bias, but *mutatis mutandis* "[i]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course at charm school.'" *Hopkins*, 490 U.S. at 256 (plurality).

reasons for hiring for these nearly identical jobs were inconsistent with each other. What was consistent was that, in each case, the stated reasons and criteria favored the male applicant. From the shifting criteria that favored the male applicants, a jury could infer that the different stated reasons were not honest and were pretexts for sex discrimination.

When the male applicant for the girls' job (Arredondo) had more recent experience than Joll professionally coaching high school cross country (though much less experience overall), the school district said that was the controlling factor. When the male applicant (Kerezman) was "in the building" during the school day with the opportunity to build "rapport with the boys," that became the controlling factor instead. Joll's long presence in the middle school and in the school system with opportunity to build "rapport with the girls" was not considered in her favor vis-à-vis Arredondo. Her more extensive and apparently more recent professional experience coaching high schoolers was not considered in her favor vis-à-vis Kerezman. Further, Polite's opinion, given such weight as to Joll's "dominate personality," was apparently given no weight at all as to the transferability of Joll's middle school experience to the high school setting. These inconsistent choices of criteria for nearly identical jobs are not necessarily decisive in Joll's favor, but they could certainly support a jury's inference that the real reasons for the decisions were based on sex.

Employment discrimination law has long recognized that an employer's dishonest explanation of a decision can support an inference that its real reason was unlawful. If the jury does "not believe the employer's explanation for its decisions,

it may infer that the employer is trying to cover up … discrimination," *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994), "particularly if disbelief is accompanied by a suspicion of mendacity." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). See generally *McDonnell Douglas*, 411 U.S. at 804–05 (suggesting types of evidence that would support finding of pretext). In other words, the jury may infer that "the real reason was a forbidden one." *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996); see also *Troupe*, 20 F.3d at 736. Again, however, we emphasize that Joll does not rest her case on pretext alone. A plaintiff is *required* to show pretext when her only other evidence of discrimination is the prima facie *McDonnell Douglas* showing. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123–24 (7th Cir. 1994). Where the plaintiff does not rely solely on *McDonnell Douglas*, she may survive summary judgment even without evidence that the employer's explanation is dishonest. *Venters v. City of Delphi*, 123 F.3d 956, 974 (7th Cir. 1997).

A further indicator of less than perfect forthrightness is Hofer's fluctuating accounts of his involvement in hiring the girls' coach. See, e.g., *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999) (reversing summary judgment for employer); *E.E.O.C. v. C.G. Schmidt, Inc.*, 670 F. Supp. 2d 858, 869 (E.D. Wis. 2009) (denying summary judgment: "CGS has shifted their story on who was involved in the decision to lay off Jackson, providing some evidence, albeit not very strong evidence on its own, that retaliation occurred."). In his deposition, Hofer testified that "Dr. Amones and the head coach Adam Nellessen made that decision." In his affidavit, he testified: "The decision as to which candidate to recommend for the position was made by all three of us," that is, Hofer, Amones, and Nellessen.

Another indicator of pretext are the shifts in relevant qualifications outlined above, with their consistent operation in the men's favor, both as between the girls' and boys' positions and as between the event and the litigation. See, e.g., *Stalter*, 195 F.3d at 291 ("Stalter presents one more piece of persuasive evidence, and that is that Wal-Mart changed its story between the time of the state administrative proceeding and the federal action."), citing *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 634 (7th Cir. 1996), and *Perfetti v. First Nat'l Bank of Chi.*, 950 F.2d 449, 456 (7th Cir. 1991). We have said time and again (in more than one hundred reported opinions, by our count) that we are not a super-personnel department that will substitute our criteria for an employer's for hiring, promoting, or disciplining employees. See, e.g., *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). That hesitation and the often subjective character of many employment decisions can make it difficult for a lone plaintiff to show that a single employment decision was made for unlawful reasons. But inconsistent explanations, especially from the same decision-makers about similar decisions near the same time, can support an inference of unlawful intent.

We conclude with a few observations on the district court's analysis. First, as a general matter it cannot be emphasized too strongly: "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself … . Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded," and the case must be assessed for an "overall likelihood of discrimination." *Ortiz*, 834 F.3d at 765, 763.

More specifically, the district court quoted our opinion in *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180–81 (7th Cir. 2002): "where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless … no reasonable person … could have chosen the candidate selected over the plaintiff for the job in question" (internal quotation marks omitted).

We have tried to make clear that the *Millbrook* rule applies only where "the plaintiff relies *exclusively* on evidence of the applicants' comparative qualifications." *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003) (emphasis added); see also, e.g., *Robertson v. State of Wis. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) ("the plaintiff's qualifications alone do not establish evidence of pretext"). This is not such a case. Joll has presented much more evidence beyond the comparison of qualifications. And again, Joll would be required to show pretext only if she were proceeding under *McDonnell Douglas* and had no evidence of discrimination beyond her prima facie case. *Anderson*, 13 F.3d at 1123–24.

Second, in response to Joll's evidence of the shifting criteria for the two hiring decisions, the district court cited two non-precedential orders of this court for the proposition that no inference of discrimination arises where the successful applicant turns out to have self-evidently better or broader qualifications that merely happened not to be listed in the initial job solicitation. *Tai v. Shinseki*, 325 F. App'x 444, 447 (7th Cir. 2009) (chosen applicant had "a more diverse range of experiences and showed more enthusiasm"); *Currie v. Paper Converting Mach. Co.*, 202 F. App'x 120, 122 (7th Cir. 2006) ("Ropson

claimed in his application that he could operate both a jig bore and a boring bar.") These non-precedential orders are—well, non-precedential. On the relevant point of comparative qualifications, however, both orders quoted *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006), which in turn quoted *Millbrook*. In *Millbrook*, as noted, the comparative qualifications were the plaintiff's *only* evidence of unlawful motive in addition to the prima facie case. Again, that does not describe the facts of this case; evidence of Joll's stronger qualifications is only part of her evidence of sex discrimination. Neither of the cited non-precedential orders involved inconsistent changes in hiring criteria that had the effect of favoring one sex or race over another across multiple decisions.

Finally, the district court also erred to the extent it dismissed Joll's evidence of sex-role stereotyping as mere "stray remarks" that were not probative of unlawful intent in the hiring decision. The "stray remarks" rationale can be applied only to remarks that are not part of the decision-making process itself. See, e.g., *Overly v. KeyBank, N.A.*, 662 F.3d 856, 865 (7th Cir. 2011) (affirming summary judgment where highly offensive remark was made after plaintiff resigned); *Davis v. Time Warner Cable of Southeastern Wis., L.P.*, 651 F.3d 664, 672–73 (7th Cir. 2011); see also *Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000) (warning against over-reading "stray-remarks" cases: "All that these cases hold—all that they could hold and still make any sense—is that the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the *decision* had a discriminatory motivation."). But Joll's evidence comes from the decision-makers during the decision process.

In considering a defendant's attempt to neuter a sexist or racist comment as a stray remark, a court deciding a summary judgment motion must keep in mind its duty to consider the evidence as a whole and to do so in the light reasonably most favorable to the non-moving party. A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally. See *Emmel*, 95 F.3d at 632 ("Emmel does not rely on these remarks alone to prove anything. The remarks are evidence, which together with the other evidence in this case could lead a jury to conclude … that the company engaged in unlawful discrimination… . [T]he statements in question are more than just stray comments … . They are from the top policymakers in the company … . They directly address the policy at issue … ."), discussing *Hopkins*, 490 U.S. at 277 (O'Connor, J., concurring in the judgment); cf. *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 820 (7th Cir. 2012) ("same actor" inference permits but does not require inference that attitudes of person who hired plaintiff, for example, would not have changed by time same person fired plaintiff). Similarly, the district court strayed outside the bounds of summary judgment practice by accepting that the "dominate personality" comment spoke simply and innocently to the employer's nondiscriminatory interest in "personality fit" and could not support an inference of discrimination. See *Hopkins*, 490 U.S. at 256 (plurality) ("[I]f an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that has drawn the criticism.").

*Conclusion*

We recognize, of course, that there are ways to tell the story of the school district's hiring process and decision that are entirely innocent, involving no unlawful discrimination. The dissenting opinion illustrates several ways the defense could argue this case to a jury. But because there is at least *one* reasonable way to tell the story in favor of Joll's claim of sex discrimination, a jury rather than appellate judges must choose among them.

The grant of summary judgment for the defendant on Joll's age discrimination claim is AFFIRMED. The grant of summary judgment on the sex discrimination claim is REVERSED and the case is REMANDED for trial on that claim.

RIPPLE, *Circuit Judge*, dissenting. In response to a motion for summary judgment, "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Here, the question is whether Ms. Joll came forth with sufficient evidence from which a reasonable jury could conclude that VCS failed to hire her for the girls' assistant cross-country position or for the boys' assistant cross-country position because she was a woman. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).

On an appeal from the grant of summary judgment, we view the record as a whole "and all justifiable inferences drawn from it in the light most favorable to the party against whom judgment was entered," here Ms. Joll. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994); *see also Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015). "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks omitted). However, we have not "interpret[ed] the quoted language so broadly as to require a court to ignore the uncontroverted testimony of company employees or to conclude, where a proffered reason is established through such testimony, that it is necessarily pretextual." *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002).

Based on a review of the entire record, I do not believe Ms. Joll has come forward with evidence from which a reasonable jury could conclude that, had she been male, she

would have been awarded either of the positions for which she applied. I therefore respectfully dissent.

**I**

Ms. Joll has coached cross country and track for many years and has a long tenure of coaching in Valparaiso. From 1991 to 1995, she was the assistant girls' track coach at Valparaiso High School ("VHS"). Beginning in 1994 and continuing through 2004, she was the assistant men's and women's cross-country coach at Valparaiso University. During the same relative time frame (1995 to 2005), she co-coached track and field at Thomas Jefferson Middle School in Valparaiso; and from 2005 to 2013, she co-coached cross country at Thomas Jefferson Middle School. Ms. Joll described her coaching responsibilities at Thomas Jefferson Middle School accordingly: "The way the middle school program works, … we were both equal coaches and it's not girls and boys. It's a combined program at the middle school." R.24-1 at 4 (Joll Dep. 12).

In 2013, Ms. Joll resigned her coaching position so that she could travel with and watch both of her daughters compete in cross country and track. At that point, one daughter was running at Indiana State University, and one was running at VHS. Ms. Joll felt that the other coach at Thomas Jefferson Middle School "needed somebody who was more dedicated at that point in time to coaching." *Id*. at 5 (Joll Dep. 16). In her resignation letter, she told the principal of Thomas Jefferson Middle School, Jim Polite, that she felt that "couldn't devote … [a] sufficient amount of time to … adequately do the job." *Id*. (Joll Dep. 17).

**A. Girls' Cross-Country Position**

In 2014, Ms. Joll's older daughter stopped running at Indiana State, and Ms. Joll wanted to coach again. On approximately June 17 of that year, Ms. Joll applied for a position as an assistant coach with the VHS girls' cross-country team. *See id*. at 7 (Joll Dep. 22–23).

In 2014, VHS did not have a "written hiring procedure for coaches." R.29-4 at 2 (Hofer Dep. 9). Herb Hofer, who was Athletic Director of VHS at the time, explained he had a "typical … process" that he "use[d] as an AD" for the hiring of assistant coaches. *Id*. at 5 (Hofer Dep. 12). His "normal process for hiring assistant coaches" began when the position was posted on the school system's website. *Id*. Resumes would come either to him or to the VHS Principal, Dr. Reid Amones. Mr. Hofer and the head coach then would review the candidates and decide whom to interview. Mr. Hofer and the head coach would conduct the interviews and come to a consensus as to the best candidate for the position. *See id*. Mr. Hofer contacted a candidate's references after he and the head coach had made a hiring decision, but prior to bringing the matter before the school board. *Id*. at 10 (Hofer Dep. 32).

It is undisputed that Mr. Hofer, the person who usually oversaw the hiring process for assistant coaches, "was having knee surgery" at the time the interviews and deliberations for the girls' assistant cross-country coaching position were occurring. *Id*. at 5 (Hofer Dep. 12); *id*. at 14–15 (Hofer Dep. 36–37). Indeed, Ms. Joll emailed Mr. Hofer "towards the end of June" to determine when interviews would be held, and Mr. Hofer responded that "they were going to be doing it that next week, but he had knee surgery and so he

was recovering from that." R.24-1 at 7 (Joll Dep. 23). Instead, Dr. Amones and the girls' cross-country head coach, Adam Nellessen, conducted the review of candidates, interviews, and follow-up. The following week, Coach Nellessen contacted Ms. Joll to ascertain if she would be available for an interview on July 5th.

Ms. Joll's interview lasted "[m]ore than half [of an] hour, but less than an hour." *Id*. (Joll Dep. 24). During her interview, she was asked "[w]hy [she] was … applying when [she] had resigned? What had changed?" *Id*. (Joll Dep. 25). Ms. Joll explained that one of her daughters was no longer running at the collegiate level and so she "didn't feel pulled to go and see her compete." *Id*. at 8 (Joll Dep. 26). She also was asked how being the parent of one of the athletes might affect her ability to coach the rest of the team. *See id.* (Joll Dep. 28–29).

Following the interview, Ms. Joll was asked to provide references, and Dr. Amones contacted those references. Ms. Joll received favorable recommendations from several individuals, including Jim Polite, the principal of Thomas Jefferson Middle School, where Ms. Joll taught and where she had coached for eighteen years. In emailing Polite, Dr. Amones specifically inquired whether Ms. Joll had any "past roles serving as an assistant, or other times she has not been the one making the final decision." R.29-6 at 5. Polite responded that "[t]his area would be my only concern. She has a dominate [sic] personality. If she … already has a good relationship with the head coach, it would probably be fine. If not, I could envision some issues arising." *Id*.

There was one other applicant interviewed for this position: John Arredondo. From 2008 to 2014, Arredondo

coached in the boys' cross-country and girls' track programs at Portage High School.[1] From 2008 to 2013, he also coached boys' cross country at Portage High School. He testified that he had resigned his positions because he was going through a divorce; the record does not reveal whether, in his resignation letter, Arredondo provided a reason for his departure.

In the summer of 2014, Arredondo began volunteering as a girls' cross-country coach with VHS. When a paid position came open, Coach Nellessen suggested to Arredondo that he should apply. Arredondo testified that, during his interview, he was asked about "[c]oaching experience, what [his] coaching philosophy is, a lot of shop talk." R.29-3 at 15 (Arredondo Dep. 37). Arredondo also was asked about whether commuting from Portage to VHS would be a problem. *Id*. at 16 (Arredondo Dep. 38). There is no evidence in the record—or at least none to which Ms. Joll has invited our attention—that Arredondo gave Portage High School a specific reason, much less a specific family-related reason, for resigning his coaching position. There also is no evidence in the record that Arredondo made Coach Nellessen or Dr. Amones aware of the reason he had resigned his position at Portage. During Arredondo's deposition, Ms. Joll's coun-

---

[1] It is unclear whether Arredondo had head coaching experience. Ms. Joll states in her brief that he was the assistant in these positions, but that he served one year as head coach of girls' track in 2010. *See* Appellant's Br. 10. In support of this statement, Ms. Joll cites to Arredondo's deposition, *see* R.29-3 at 2 (Arredondo Dep. 5), and to his resume. However, Arredondo's resume is not part of the record. In his deposition, Arredondo simply states that he "coach[ed]" girls' track and field and boys' cross country, but he does not specify (at least on the page referenced) whether he served in a head coaching role. *Id*.

sel did not ask Arredondo whether he had informed Coach Nellessen or Dr. Amones of the reason that he had resigned his position. Moreover, Ms. Joll's counsel did not ask Arredondo whether during his interview he was questioned about familial obligations that might interfere coaching responsibilities. Ms. Joll's counsel simply asked Arredondo to characterize the "type of questions" he was asked during his interview. R.29-3 at 15 (Arredondo Dep. 37). Her counsel's only follow-up question regarding what Arredondo was asked during his interview was: "Did they ever ask you if the commute would be an issue from Portage to Valparaiso?" *Id*. at 16 (Arredondo Dep. 38).

The decision was made by Coach Nellessen, Dr. Amones, and Mr. Hofer to hire Arredondo. In his call explaining the hiring decision to Ms. Joll, Mr. Hofer stated that Arredondo had "more current experience working with high school age athletes." R.29-6 at 7. In his deposition and affidavit, Mr. Hofer testified that Polite's statement also caused them pause as to whether Ms. Joll could serve in the capacity of an assistant, as opposed to head coach. *See* R.29-1 at 4 (Hofer Aff. 2); R.24-2 at 7 (Hofer Dep. 31).

After the decision was made to hire Arredondo, Mr. Hofer checked Arredondo's references in preparation for proposing his appointment to the board. *See* R.29-4 at 14 (Hofer Dep. 36).

## B. Boys' Cross-Country Position

After Ms. Joll was unsuccessful in obtaining the girls' coaching position, she applied for a position as the assistant boys' cross-country coach at VHS. She was interviewed for the position by the head coach of the boys' cross-country

team, Aaron Crague, as well as Mr. Hofer. Ms. Joll again was asked about the reason she had resigned the position of cross-country coach at Thomas Jefferson Middle School. *See* R.24-1 at 13 (Joll Dep. 70). The other candidate for the position was Ben Kerezman. Kerezman was a teacher at VHS, had volunteered with the boys' cross-country team and had served as an assistant coach for the VHS boys' track team. Mr. Hofer and Coach Crague collectively decided to hire Kerezman for the assistant coaching position.

Mr. Hofer informed Ms. Joll that she did not receive the job because Kerezman had better rapport with the boys on the team. *See id*. (Joll Dep. 72). In his affidavit, Mr. Hofer explained that this rapport stemmed from Kerezman's volunteering with the cross-country team and from his serving as a high school teacher in the same building where the team members went to school. R.29-1 at 5 (Hofer Aff. 3). According to Mr. Hofer, he and Coach Crague believed that Kerezman's service on the faculty was "an advantage to building, developing and maintaining the necessary relationship with high school athletes." *Id*.

Unlike with Arredondo, Mr. Hofer did not check any references for Kerezman. R.29-4 at 17 (Hofer Dep. 49). Mr. Hofer explained that Kerezman's references were not checked because "he was a teacher at the high school," he had coached with the cross-country team on a voluntary basis, had been "a paid assistant for our track [program]," and Mr. Hofer "personally kn[e]w him as a coach." *Id*.

## II

Ms. Joll contends, and my colleagues conclude, that she has come forward with sufficient evidence from which a jury

reasonably could conclude that her gender was the reason that she did not get either position at VHS. In doing so, they treat her unsuccessful applications for the girls' cross-country position and for the boys' cross-country position as a single determination. A "refusal to hire," however, is a "[d]iscrete act," and "[e]ach incident of discrimination … constitutes a separate actionable unlawful employment practice." *Nat'l R.R. Passenger Corp.*, 536 U.S. 101, 114 (2002) (internal quotation marks omitted). As such, we must evaluate independently each of Ms. Joll's failure-to-hire claims to determine whether a statutory violation has occurred. *Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 858–59 (7th Cir. 2019) (evaluating each of the plaintiff's four failure-to-promote claims, which involved positions open between March 2016 and February 2017, independently).[2]

## A. Girls' Cross-Country Position

My colleagues conclude that, taken collectively, the evidence of sex-stereotyping, deviation from established procedure, changing rationales, and disparity in qualifications raise an inference of discriminatory intent. I evaluate each category of evidence individually and then consider them collectively.

---

[2] Even if it were not the established rule that we evaluate each failure to hire independently, here the facts would warrant such an approach. Although the positions at issue were similar, there were a different set of decisionmakers for each position, there were a different set of candidates for each position, and, given Mr. Hofer's knee surgery, there also was a different process that governed each decision.

**1.**

In Ms. Joll's view, the strongest argument that her gender played a role in the decision-making process for the girls' cross-country position was VCS's reliance on sex-stereotypes. According to my colleagues, there is evidence of sex-stereotyping both in the way the interviews were conducted and in Polite's use of the term "dominant" to describe Ms. Joll.

Turning first to the interview process, my colleagues note that the questions asked of Ms. Joll "would not necessarily show bias." Maj. at 14. The problem as they see it is that, "although family matters had recently prompted his resignation from a similar position, Arredondo's commitment was not questioned. He 'talked shop,' not kids, with the interviewers." *Id*. However, there is no evidence in the record that Coach Nellessen or Dr. Amones knew of the reason for Arredondo's resignation. Arredondo's deposition does not reveal what he said in his resignation letter, if that letter was provided to Coach Nellessen or Dr. Amones, or if Arredondo informed Coach Nellessen or Dr. Amones about the reason for his resignation. By contrast, Coach Nellessen and Dr. Amones were aware of Ms. Joll's specific reason for resigning: she wanted to be able to attend her daughters' meets. Any focus on "kids" in the interview was prompted by Ms. Joll's resignation letter and does not raise an inference of discrimination.

My colleagues also agree with Ms. Joll that Polite's email, describing Ms. Joll as having a dominant personality, constituted sex-stereotyping that infected the decision-making process. There is no question Polite's evaluation of Ms. Joll was at least a factor in the decision-making process. Given

that Polite had directly supervised Ms. Joll at Thomas Jefferson Middle School (where Ms. Joll worked as a teacher and had coached for eighteen years), it is not surprising that Polite's comments carried weight with Coach Nellessen and Dr. Amones not matched by her other recommenders.

Polite's comments, however, do not fall into the category of "sex-stereotyping," at least as that term traditionally has been understood. In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Court held that the practice of gender stereotyping falls within Title VII's prohibition against sex discrimination. In *Hopkins*, a female employee sued Price Waterhouse for discrimination when she was not elected as a partner. In assessing comments made by partners who evaluated Hopkins, the Court noted that there

> were clear signs … that some of the partners reacted negatively to Hopkins' personality because she was a woman. One partner described her as "macho"; another suggested that she "overcompensated for being a woman"; a third advised her to take "a course at charm school." Several partners criticized her use of profanity; in response, one partner suggested that those partners objected to her swearing only "because it's a lady using foul language." Another supporter explained that Hopkins "ha[d] matured from a tough-talking somewhat masculine hard-nosed mgr to an authoritative, formidable, but much more appealing lady ptr candidate." But it was the man who … bore responsibility for explaining to Hopkins the reasons for the Policy Board's decision to place

> her candidacy on hold who delivered the *coup de grace:* in order to improve her chances for partnership, Thomas Beyer advised, Hopkins should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."

*Id*. at 235 (internal citations omitted). The Court observed that "[i]t [took] no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course at charm school,'" nor "to know that, if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that has drawn the criticism." *Id*. at 256.

As *Hopkins* and our later cases make clear, it is an individual's failure to meet social preconceptions about what is "male" or "female" that raises the inference of discrimination. There must be, therefore, some evidence of "preconception." In *Hopkins*, as already described, the Court relied on overt references to male and female stereotypes. Gender-neutral remarks also might reflect sex-stereotyping, but there has to be some evidence that those gender-neutral comments reflect preconceptions of how men and women should conduct themselves. For instance, in *Bellaver v. Quanex*, 200 F.3d 485 (7th Cir. 2000), a woman employee was disciplined and eventually let go due to her lack of interpersonal skills. We observed that,

> [w]hile it is permissible to evaluate an employee's interpersonal skills when those skills are relevant to the job, evaluations may demonstrate discriminatory intent when employees

are evaluated on how their interpersonal skills match stereotyped, unequal ideas of how men and women should behave. …

As in *Price Waterhouse*, the evidence suggests the employer here may have relied on impermissible stereotypes of how women should behave. Bellaver's evaluations are marred only by the repeated references to her interpersonal skills, but these same types of deficiencies seemed to be tolerated in male employees.

*Id*. at 492.

Here, there is no evidence to suggest that Polite's assessment of Ms. Joll's personality was based on a preconceived notion of how women should behave. Polite was Ms. Joll's direct supervisor at Thomas Jefferson Middle School. He had firsthand knowledge of how Ms. Joll interacted with others and, specifically, with a supervisor. He provided his assessment in response to a direct question of how Ms. Joll might handle being in the role of an assistant, as opposed to being in charge of a sports program. Thus, his assessment, based on his experience supervising Ms. Joll, spoke directly to a quality that would bear on her ability to perform the job for which she was being considered. Polite's use of a linguistically accurate word to describe a job-related trait of Ms. Joll does not constitute sex-stereotyping. Indeed, it is difficult to conceive of how Polite might have voiced his legitimate concerns without running afoul of the majority's conception of sex-stereotyping. The majority, it would seem, would find it equally troubling if Polite had described Ms. Joll as used to

being in charge, accustomed to running a program her own way, or not used to being in a subordinate position.

There also is no evidence in the record that this quality—a need or desire to be "in charge"—was tolerated in the male candidate for the job. My colleagues explain that "it's easy to think that a dominant personality is often viewed as a *virtue* of at least male athletic coaches." Maj. at 16. But there is no evidence in the record that Coach Nellessen, Dr. Amones, or Mr. Hofer believed this to be the case—especially with respect to professional relationships with other members of the coaching staff. Inferences based on speculation and conjecture cannot be used to defeat a summary judgment motion. *See, e.g.*, *Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019). Additionally, the record does not support (or even suggest) that Arredondo, the successful candidate, had a "dominant" personality. Indeed, it appears that the wealth of his experience was as an assistant coach.[3] Because he had not spent significant time in charge of his own program, there was no need to question whether he easily could step into an "assistant" position.

At bottom, the comment from Polite is not the kind of sex-stereotyping condemned in *Price Waterhouse* where an employment decision was based on the plaintiff's failure to conform to the partners' view of how a woman should act. Instead, Polite's reference spoke directly to whether Ms. Joll, who had been a head coach for several years, could play a successful supporting role in someone else's program.

---

[3] *See supra* note 1.

**2**.

Ms. Joll also asserts, and my colleagues accept, that the checking of Ms. Joll's references prior to a hiring decision being made was a "deviation from standard procedures" which "lends support to her claims." Maj. at 15. Mr. Hofer testified that, at the time VHS was hiring an assistant girls' cross-country coach, there were no written procedures governing the process of hiring assistant coaches. As a matter of practice, however, he would check all candidates' references just prior to presenting their candidacies to the board. *See* R.29-4 at 14 (Hofer Dep. 36). But it was not Mr. Hofer who contacted Polite about a reference for Ms. Joll. Instead, Dr. Amones and Coach Nellessen had taken charge of the hiring process for the assistant girls' cross-country position while Mr. Hofer was out of the office due to knee surgery. Although "[s]ignificant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent," *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012), there is nothing inherently suspect about Dr. Amones's proceeding in a different manner than Mr. Hofer. Moreover, there is no reason why Dr. Amones and Coach Nellessen should not have contacted candidates' references if they believed it would inform their hiring decision. Finally, there is no evidence in the record that Dr. Amones and Coach Nellessen *only* contacted Ms. Joll's references. Mr. Hofer testified that both candidates' references were available to Dr. Amones and Coach Nellessen, and Mr. Hofer did not know whether Principal Amones or Coach Nellessen contacted Arredondo's references. R.29-4 at 15 (Hofer Dep. 37). There is no evidence *on this record* that

Dr. Amones and Coach Nellessen treated the candidates differently with respect to checking references.

**3.**

Ms. Joll also contends that VCS offered shifting criteria for why it did not hire her, and that offering different explanations supports her claim of discrimination. "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *See, e.g.*, *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) (collecting cases). In *Appelbaum*, for example, the employer had terminated the plaintiff's employment and, initially, had told her that it was on the basis of a breach of confidentiality and her poor performance. Later, the employer "backed off" the performance rationale, calling it just an "aggravating factor" in the decision to terminate her on the basis of the breach of confidentiality. *Id*. At trial, however, the employer stated that her performance played "zero role" in the decision to terminate her employment. The employer's shifting reason for the same employment decision, the court held, raised an inference of pretext. *Id*.

Here, Ms. Joll does not claim that the defendant's rationale for not hiring her for the assistant girls' cross-country team shifted over time. Instead, she claims, and my colleagues accept, that VCS's hiring criteria shifted *from one position to another*:

> When Ms. Joll did not receive the Girls' Cross Country assistant coach position, the school stated it did not hire her because the male candidate who worked at Portage High

School, which was 9.5 miles away, had more
recent high school coaching experience. How-
ever, in subsequently failing to hire Ms. Joll for
the Boys' Cross Country assistant coach posi-
tion at Valparaiso High School, the School stat-
ed the male candidate hired worked in the
building, and that proximity was a most im-
portant factor in hiring its coaches.

Appellant's Br. 35–36; *see also* Maj. at 17–18 ("The defend-
ant's stated reasons for hiring for these nearly identical jobs
were inconsistent with each other.").

However, as noted previously, *see supra* at 32, we must
consider each failure to hire as a discrete act. This approach
is particularly sensible in a case such as this one where there
were different decisionmakers and candidates for each posi-
tion. Indeed, Ms. Joll has not come forward with any author-
ity in which we have suggested that *different* explanations for
*different* employment decisions were suspect.

With respect to the girls' cross-country position, the stat-
ed (and consistent) reason for hiring Arredondo was his
more recent experience coaching high school. In his affida-
vit, Mr. Hofer also explained that that there was concern
about Ms. Joll's ability to step into the role of an assistant.
R.29-1 at 4 (Hofer Aff. 2). This supplemental rationale, how-
ever, does not raise the specter of pretext. *See, e.g., Johnson v.
Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) ("Nordstrom
simply supplemented its explanations in the context of
EEOC charges and litigation; there has been no retraction of

any of its reasons for failing to promote Johnson nor are any of its reasons inconsistent or conflicting.").[4]

**4**.

Finally, Ms. Joll maintains that her superior qualifications raise an inference of discriminatory intent. We have explained that "evidence of the applicants' competing qualifications does not constitute evidence of pretext 'unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (internal quotation marks omitted).

Here, Ms. Joll has a wealth of experience coaching track and cross country at multiple levels. Her most recent experience was as the head coach of Thomas Jefferson Middle School, where she served from 2005 to 2013. In making the determination that Arredondo was the better choice for the girls' cross-country assistant coaching position, Coach Nellessen, Dr. Amones, and Mr. Hofer relied upon his recent experience coaching cross country at the high school level

---

[4] Even if it were appropriate to evaluate rationales across positions, however, VCS's rationales were not inconsistent. With respect to the girls' position, VCS had to choose between two individuals who did not teach at VHS. As between those two individuals, the high school chose the individual with the most recent high school coaching experience. With respect to the boys' position, VCS had to choose between an individual who was a teacher at VHS, and therefore had daily contact with the athletes he would coach, and an individual who was not a teacher at VHS. As between those two individuals, VCS chose the individual in the building.

and the fact that, unlike Ms. Joll who had served as a head coach, it would not be difficult for him to serve in an assistant position. These two criteria are directly related to the position for which Ms. Joll applied. With regard to the specific positions at issue, therefore, Ms. Joll was not clearly better qualified such that the disparity in qualifications would raise an inference of pretext or discrimination.

The majority notes that "the *Millbrook* rule applies only where 'the plaintiff relies *exclusively* on evidence of the applicants' comparative qualifications." Maj. at 21 (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003)). The majority believes that Ms. "Joll has presented much more evidence." *Id*. However, as explained at length, I do not believe there is evidence in this record to support the other inferences of discrimination that Ms. Joll asks us to draw.

At bottom, based on the evidence presented by Ms. Joll, a reasonable jury could not conclude that the decision to hire Arredondo as the assistant girls' cross-country coach was based on her gender. I would therefore affirm the district court's grant of summary judgment to VCS on this claim.

## B. Boys' cross-country position

Ms. Joll also contends that she suffered discrimination when she was not hired for the assistant boys' cross-country position. She relies on many of the same arguments made with respect to the girls' cross-country position: that the decision was affected by the use of sex-stereotypes, that different procedures were followed with respect to checking references, that there were shifting criteria for hiring, and that

she was better qualified. Thus, I address only the evidence unique to the boys' cross-country position.

Ms. Joll complains that different procedures were used to check Kerezman's references from those used to check hers. Mr. Hofer explained that Kerezman's references were not checked because "he was a teacher at the high school," he had coached with the cross-country team on a voluntary basis and had been "a paid assistant for our track [program]," and Mr. Hofer "personally kn[e]w him as a coach." R.29-4 at 17 (Hofer Dep. 49). Kerezman was a known quantity to Mr. Hofer. It indeed would be placing form over substance to require Mr. Hofer to go through the motions of checking the references of someone whom he knew personally and supervised professionally.

Ms. Joll also complains about shifting criteria for the boys' cross-country position. However, VCS consistently has stated its primary reason for the hiring of Kerezman was that he had better rapport with the boys on the team due to his being a teacher in the building, having volunteered with the program, and having been an assistant for the boys' track team. His presence in the building allowed him to build and maintain this rapport in a way that a coach from outside the building—whether male or female—could not.[5]

---

[5] As noted previously, *see supra* at 32, Ms. Joll and the majority want to evaluate whether the criteria shifts *across* positions and before different decision-making teams. The majority therefore faults VHS for focusing on recent high school experience with respect to Arredondo, but on being "'in the building' during the school day with the opportunity to build 'rapport with the boys'" with respect to Kerezman. Maj. at 18. According to the majority, these shifts worked to Ms. Joll's disadvantage:

(continued … )

Finally, Ms. Joll compares her experience to Kerezman's and concludes that she clearly is the better qualified candidate. Again, however, the position for which Ms. Joll applied was an assistant boys' cross-country position at VHS. Although she had a longer career coaching than Kerezman, she was not a teacher at VHS; Kerezman was. Kerezman had regular contact with the students and an opportunity to build on this relationship in ways that Ms. Joll could not. It is difficult to argue that this consideration is not a legitimate one. Many, including Ms. Joll, might believe that Coach Crague and Mr. Hofer should have placed more emphasis on experience than presence. However, "[a]n unwise employment decision does not automatically rise to the level of pre-

---

( … continued)

"Joll's long presence in the middle school and in the school system with the opportunity to build 'rapport with the girls' was not considered in her favor vis-à-vis Arredondo. Her more extensive and apparently more recent professional experience coaching high schoolers was not considered vis-à-vis Kerezman." *Id.*

As a preliminary matter, Ms. Joll did not have "more recent professional experience coaching high schoolers." Kerezman recently had served as an assistant coach for the VHS boys' track team. *See* R.29-1 at 5 (Hofer Aff. at 3) ("Kerezman had also recently coached boys track as a varsity assistant at Valparaiso which we felt was a plus."); R.29-4 at 16 (Hofer Dep. 44) (explaining that Kerezman had been "a paid coach for our track [program]"). However, even if this had not been the case, the fact that Coach Nellessen, Dr. Amones, and Mr. Hofer applied different criteria than Coach Crague and Mr. Hofer when faced with two different sets of candidates does not suggest discriminatory intent. It is entirely possible that, if presented with a qualified, in-building candidate, Coach Nellessen, Dr. Amones, and Mr. Hofer would have chosen that candidate over either Ms. Joll or Arredondo. This option, however, was not available to them.

text." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013). Here, the record does not support an inference that Kerezman's status as a teacher was not the true reason that he was hired, nor does it support an inference that Ms. Joll was not hired because she was a woman. Consequently, I would affirm the district court's summary judgment for VHS on this claim as well.

I close with a final observation concerning the effect of our *Ortiz* decision on summary judgment decisions. We held in *Ortiz* that, for purposes of summary judgment, we could not cabin different types of evidence into categories and consider those categories in isolation. We explained that the appropriate legal standard

> is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence.

*Ortiz*, 834 F.3d at 765. However, we also were clear that "[r]elevant evidence must be considered and irrelevant evidence disregarded." *Id*. *Ortiz* did not cast aside our well-honed rules for determining when particular types of evidence (the use of different procedures, shifting rationales, etc.) are relevant and probative of discrimination. Today's decision demonstrates graphically how this principle can be

disregarded when the *Ortiz* approach is employed to evaluate a summary judgment motion.

Here, the question is whether Ms. Joll came forth with sufficient relevant and probative evidence from which a reasonable jury could conclude that VCS failed to hire her for the girls' assistant cross-country position or for the boys' assistant cross-country position because she was a woman. For the reasons set forth above, I do not believe Ms. Joll has met her burden with respect to either position, and I therefore would affirm the judgment of the district court.